All right, Ms. Burton, happy to hear from you. Thank you, Your Honors. Good morning. May it please the court. My name is Megan Burton, and I represent the appellants in this case, Stanley Kaiser, 1899 Holdings, LLC. and the affiliated entities identified in the briefs. A quick summary of the case. This case arises out of the major rehabilitation of a historic property in Baltimore City. The Kaiser entities, and I'm referring to the appellants as the Kaiser entities, spent eight years of their time, energy, and over $3 million to bring the redevelopment of this property, the Northern District Police Station, to fruition, only to have their right to recoup those funds and to be paid for their efforts as both managing member and developer of the project, stripped from them by the tax credit investor member just weeks before the project was certified as complete. And at that time, the investor member received millions of dollars in tax credits. The Kaiser entities sued to enforce those rights under the operating agreement and the amendment that are at issue today, and sufficiently alleged breach of contract claims based on holdings removal, the company's refusal to pay the developer fee, and refusal to repay loans that the Kaiser entities had made to the company. Those are the claims in a nutshell. The district court granted the 1899 LLC's 12B6 motion to dismiss, and that's really the key here, is that we're here on a 12B6 motion to dismiss for failure to state a claim. We appealed from that ruling because the district court failed to adhere to the proper standards for considering such a motion. To grant a 12B6 motion based on a contract where there's a contract between the parties, the contract must clearly and unambiguously bar the claims. The relevant contracts in this case, namely the operating agreement and the amendment thereto, and other project documents which are incorporated in the operating agreement, do not clearly and unambiguously bar the plaintiff's claims in this case. In granting the 12B6 motion, the district court misinterpreted and misapplied the contracts and made factual determinations which are completely inappropriate at the 12B6 stage. Again, the four claims really at issue, if you distill all the counts into four different issues, is the removal of the managing member, the payment of the developer's fee, the loans, and the claim for an accounting. I'll talk about the removal first. In order to hold that small deal, who's the investor member here, the tax credit investor member, federal tax credit member, properly removed holdings from its position as managing member of the company, the district court made a factual determination that merely because certain lien judgment existed at the time of the removal that the removal was proper under the operating agreement. The factual determination simply could not be made at this stage. Moreover, the court's conclusion that the basis, these liens, was consistent with the terms of the operating agreement was not consistent. Ms. Burton, let me ask you about that just so I understand if there's a distinction here. I thought the district court took judicial notice not just of liens, which as I understand are simply just claims, but actual judgments that have been entered with respect to the project. Is that right? That's correct, Your Honor. Well, if that's correct, then why isn't the latter with respect to judgments fairly substantial evidence that, in fact, your client wasn't meeting its obligations to make the requisite fund payments? There are several reasons why that isn't enough under the operating agreement. The operating agreement requires for the investor member to remove the managing member. The managing member must violate a term of the operating agreement, must not cure that violation, and the violation must have a material adverse effect on the company. There are several factual determinations that had to be made in order for the district court to conclude. You keep saying that the factual determinations have to be made, but in reading the district court opinion, it seemed to me that she was adhering fairly scrupulously to the language of the contract itself, most specifically Section 6.10a, which is not good for you. Your Honor, Section 6.10a speaks to the violation of the obligation to provide funds. And as we've argued in our briefs, the obligation to provide funds is not the same as the existence of a lien judgment. And the reason that is is because there's other language in the operating agreement that contemplates that the project can be completed, which is really the managing member's ultimate obligation is to complete the project. But there's language that says that the project can be completed if in the existence of liens, so long as there are plans in place to satisfy those liens. And as a factual matter, and this is in the amendment, the liens could have been paid as soon as the investor members made that next installment payment, which would have been at project completion less than weeks, just weeks away. Taking the contract as a whole, what the contract did was set up a fairly common division in commercial dealings, which is that one party is an investor and the other party is a manager. And your entire duty under the contract as a managing partner was to see that the project ran smoothly. The investor is removed. The investor simply is not expected to and cannot adopt a hands-on view in dealing with suppliers and dealing with cash flow and all the rest. That's the whole reason the managing partner is hired, to avoid having the project run into debt, to avoid having all sorts of outstanding mechanics liens, to avoid having the thing crash with shortfalls and having cost overruns overtake the whole thing. And your job as managing partner was to avoid the very things that happened. And if they happened, you had to make up for it on the managing partner's debt. And that is what this contract says. The very things you were hired to avoid happened, which I suppose is okay, but then you've got to put in the money to make sure that those things are cured. And that's the point, Your Honor. And at that point, they're treated as capital contributions. They're not treated as loans. That's the whole point of the contract. Well, Your Honor, I mean, there's several different issues, but the point is here that isn't exactly what happened because there were plans made and arrangements made for the investor member to provide additional funding. There was promissory notes signed by Small Deal, which are in the record, which show that Small Deal was essentially stepping in in that obligation to provide funds. And the rally agreement, which is alleged in the complaint, the rally agreement is not in the record itself, but the allegations are there, that states that the rally agreement, under that agreement, Small Deal took over some of those obligations to provide funds to the project. And, again, that amendment gave an additional payment to the company at project completion, which would have paid all of those outstanding debts. And, again, those are all factual questions that have to be weighed. This isn't a 12B6 situation where you can say emphatically that the language in the operating agreement clearly bars these claims simply because those are what the managing member's obligations were. There's enough facts to show that there were changes made in the case. You keep saying that, but I don't know that you've isolated any of these factual questions in your briefs or wherever with any sort of precision. And one of the things is that, you know, you mire a contract in ceaseless litigation like you wish to do. You deprive the parties of the benefit of their bargain so long as the contract itself is reasonably clear because a contract involves not only an effort by parties to set out mutual obligations and to put limits on risk, but also to have a document which, in the event that it's clear, will save them the expense of litigation. And to throw all this into litigation simply deprives one party of the benefit of a bargain. If, as I think the district court found, your obligations with respect to managing this actual project were fairly set out in an integrated document. Well, your Honor, again, I think the key there is the document's not clear. And particularly I think that's evident in the developer's fee situation. In this case, the operating agreement, and this is at Joint Appendix 200, specifically states with respect to the developer's fee that the developer fee shall be deemed earned in its entirety as of the date of construction completion, which in this case was in December of 2008. And it goes on to say that the developer shall be paid such portion of the developer fee from available debt and equity proceeds of the company to the extent such proceeds are not required for other company purposes. So it obviously contemplates that there is a calculation that needs to be made, and this is both part of our developer's fee claim and then also the accounting. But you don't affirmatively allege in your complaint with respect to that claim that, in fact, there were funds available. You just say, we earned it, we don't know, let's have an accounting. How does that state a plausible claim? Well, Your Honor, the complaint states as to the developer fee. It does, we do allege that defendants have acknowledged the plaintiff's entitlement to its agreed upon fee, but simply refused to identify an account for the debt and equity proceeds. So, you know, again, we're saying it's due. It means it's earned, right? But then once earned, then the next thing has to happen, that there has to be sufficient funds in the till to pay that are not otherwise, that the company can't otherwise in its discretion use for other purposes. And that seems to me the problem is how is anyone, a fact finder or a jury, supposed to sort that out when you haven't even alleged that, in fact, there were funds outside of normal operating expenses to pay that fee? Your Honor, I mean, I think it's implicit in the allegations that, you know, if there's funds, then we're due to be paid, and we don't know whether there's funds there. So we couldn't affirmatively allege, I mean, we could have said, yeah, there's funds, but we don't know. I guess I'm asking, how does that allege a breach of contract? Because, again, it's that there's a debt that's due under the operating agreement. We've alleged the debt is due. We've referred to the operative contract that controls. But there's a condition precedent that has to be satisfied before the actual payment is made. And with respect to that, there's no specific claim that the company had funds available, that it was not using for other legitimate purposes and refused to pay. Is there? I think we've alleged elsewhere that there's claims, well, we have alleged claims of bad faith in terms of the company's refusal to pay some of these fees and to pay amounts that are otherwise due to the managing member and the developer. Can I switch the subject for just a minute with respect to the developer fee? I didn't understand why you thought that was right, given the fact that, as I understand it, the fee wasn't even due until any fee. If there was a fee, it wasn't due until the last day of 2017. I don't think the operating agreement says that, Your Honor. The operating agreement says that it's due at construction completion. It's just a question of how much is due. And then at the ultimate outside, the December 2017 deadline, is when, at that point, the managing member would actually have to borrow funds in order to pay the developer fee. But at construction completion, which was December 2008, it was due. I mean, the operating agreement says it shall be paid. And the district court made a determination that the company actually did not have enough funds to pay the developer's fee, which the district court simply didn't have a basis to do that at a 12b6 motion. So there's several reasons why the district court's determination as to the developer's fee was incorrect. What about this independent action in accounting? Why isn't accounting generally just a part of discovery? There are very few jurisdictions that have a stand-alone independent action in accounting. If the contractual provisions don't provide a breach, why isn't that the antecedent question as to whether the contractual provisions establish a breach? And if there's no establishment of a breach, then there's no need for an independent action in accounting. Now, if there is a breach, maybe you get to an accounting as part of a discovery. But what you do have to do as a threshold matter is to establish whether there's been any kind of breach in the first place. But you just don't throw an opposing party to a contract into an independent action for an accounting as a matter of course. Your Honor, I see we're running out of time. May I answer the question? Do you want to reserve it until rebuttal, or would you like to answer it now? I can answer it quickly now, and then I can answer further questions on rebuttal. Essentially, there's two reasons why the accounting claim is there. To some extent, you're correct, Your Honor, and it is tied to, for example, the developer's fee. We don't know really how much money there is there to support our developer's claim fee unless we have an accounting and know, as Your Honor was stating previously, whether they owe that money and whether there were funds there to pay. And when you come back on rebuttal, I think you also need to address the fact that the agreement says that the developer's fee shall be deemed earned in its entirety as of the date of construction completion. It doesn't say that it's due. It says that it's earned. And I need to ask you to address that difference in your presentation on rebuttal. All right. Thank you, Your Honors. All right. Well, we thank you. And Mr. Cayola? Good morning, Your Honors. May it please the Court. My name is Paul Cayola. I represent appellees in this matter. The district court properly dismissed the amended complaint because the express language of the company's operating agreement forecloses any possibility of liability at this time on the claims asserted in the amended complaint. I'm going to begin with the six oral loan counts. As Judge Wilkinson pointed out during Ms. Burton's argument, Section 6.10A of the operating agreement required holdings to cause the completion of the rehabilitation of the project, and if available sources of funds were not available, holdings needed to advance any development funds necessary to complete the project and until the date of construction completion also cover any operating expenses. That same section deems all such payments capital contributions, and under the operating agreement capital contributions are not repayable at all unless a removal occurs or a sale. And in the event of removal, they're not repayable for 15 years. What is the word in Section 6.10A? What is the word deficiencies? It says the managing member shall be responsible for and obligated to pay such deficiencies. How do you interpret the word deficiencies? I'm looking at the next to last line in Section 10. Your Honor, I think deficiencies refers back up to the beginning of Sub 2 where it says at the beginning of the sentence, if the available debt, equity, rental income, or other proceeds are insufficient to, and then it says acquire and complete the construction under 1, You interpret deficiencies to move to refer back, say if the revenue from the project, if the ongoing revenue from the project is insufficient to keep the project going, the deficiencies have to be paid by the managing member. Now, do you interpret deficiencies to encompass cash shortfalls, potential cost overruns, mechanics, liens? I mean, is it a kind of an omnibus word in your view? Your Honor, if you look at that full sentence as a whole, Sub 1, first there's a reference in the first clause to available debt, equity, rental income, or other proceeds. So this was an operating commercial real estate project with tenants, and it was also under development. So there was not only income from the operations of the property, there was also a construction loan, so loan proceeds, and there were capital contributions that the investor member had made. All of those. That's what the equity refers to. That's right. All of those sources of funds were available for. The first line of it refers to the income, the income and proceeds. The first line refers to the cash reserves and the. . . All that money, right. The first line refers to that. And then Sub 1 talks about rehabilitating. That's the construction piece. And Sub 2 refers to provide for all other payments and expenses. The importance of this second clause is that there's really a cutoff at construction completion. If operating income is insufficient after construction is complete, the managing member is permitted under 6.11 to make loans for operating deficits, and those would be repayable if and when. . . That's a 20-day loan. No, no, this is after construction completion. Okay. Under 6.11, inapplicable in this case, but if the managing member had reached construction completion and there were deficits ongoing going forward, loans were permissible under that circumstance. Before construction. . . That's not what we have here. No, because construction completion had not occurred during this entire period. So during the construction rehabilitation phase, the managing member is required to advance funds for both operating, as capital contribution, for both operating deficits and to deal with any cost overruns. . . Because the section says on or prior to construction completion. Exactly. But the point is that first sentence refers to the available income. You have a revenue stream arising from debt, equity, rentals, other proceeds, and the assumption is that's going to go a good way to funding the project. But it might not, and deficiencies might arise, particularly in construction work where, you know, cost overruns and delays in supplies and delays in paying subcontractors and contractors and others. So the whole question is, you know, who's going to be responsible for making up the difference? And the parties allocated the risk. You know, every contract involves a risk at the bottom. And the question is, who's going to cover the risk? And the risk here is that things might not go as swimmingly as one hopes. But the risk allocation is allocated to the managing member. And that's not an implausible allocation because the managing member is in a better position than the investing member to avoid those things and to make sure that they don't happen. And he's the one at ground level. That's correct. And that's what this contract seems to do. That's correct. During the construction phase where this project was mired until the removal, the managing member was responsible for advancing any costs above what the funds available and those other sources. What does the phrase development advances mean? Development advances is a reference to this 6.10A. That term is never defined. It's not a defined term. Does that create a problem? I don't think so, Your Honor, because when you read 6.10A, it's clear that they're developing, they're rehabilitating a project. And as I mentioned earlier, there's this cutoff at construction completion. So development advances have to do with any money put in by the managing member during the development phase. Then why exclude development advances in this warranty clause? There isn't an exclusion. What they're saying, you're talking about 6.09K, Your Honor? Right. What they're saying is this is a statement that no such advances have occurred. Excluding for this purpose any loans pursuant to Section 611 and development advances, which Judge Keenan pointed out, isn't defined. And the appellants say that that's exactly where they fit in. Except, Your Honor, that development advances is, I think, clear from the context of the full agreement. It's referring to money advanced by the managing member, which is addressed in 6.10A. Well, if it was, then why is that language in there? The reason it's there is because this provision, 6.09K, is a certification from the managing member that it hasn't made any advances, any loans or advances. It starts by saying the managing member has made no loans or advances. And then it says, of course, except for development advances. It's included because if you took out development advances from that parenthetical, there would be a certification that no development advances had been made, which is untrue. Okay. So your view is that that language then, to the extent it's exclusion, it simply defines, doesn't define, but states that there may be development advances and they are all supposed to be treated as capital contributions, not loans. That's correct. And if you look at the two provisions in 6.09K, one is loans. It says no loans or advances. And then in parenthetical it says loans under 6.11, which, again, are these operating deficit loans that only can occur after construction completion and development advances, again, a reference back to 6.10A. It's not a defined term, but it's very clear, I think, from the context of the full agreement, what's intended by development advances in that clause. The district court dismissed these loan counts based on the parole evidence rule because the supposed oral loans that are discussed occurred during the spring and summer of 2008 before the date of the First Amendment where the parties ratified both 6.09K and 6.10A and another provision I haven't mentioned yet, 14.05, which is the entire agreement provision. It provides that the operating agreement, as amended by the First Amendment, is the entire agreement between the parties and there are no prior agreements. So the appellants below placed the supposed oral loans during a time period before the First Amendment and, therefore, proof would be barred by the parole evidence rule. And that was the basis for Judge Blake's finding on the loan claims. Turning to the unjust enrichment count, these counts, basically there are six counts for unjust enrichment that correlate to the six loan counts and Judge Blake found that these claims were barred because they are on the same subject matter as the loan claims. The subject matter of the unjust enrichment counts is the treatment of these advances that the managing member made. The treatment of the advances is clearly addressed in 6.10A and, therefore, it's the identical subject matter as the express agreement. I guess they've got to come in under the bad faith exception under Maryland's law, don't they? Your Honor, the problem with all of the exceptions is that they all relate to a challenge to the enforceability of the express agreement. So if you look at Severn Marketing Associates v. Doolin, that case is a case where the unjust enrichment count was dismissed because the challenge to the agreement was not in the making of the contract, the enforceability of the contract. Here appellants have acknowledged the enforceability of the operating agreement and the First Amendment, so we don't believe that they can take advantage of any of the exceptions that would apply. Turning to the developer's fee, the developer's fee was properly dismissed by the district court. I agree with Judge Keenan that it was earned on construction completion, but that provision does not discuss payment. There is another sentence, though. What does that next sentence read? It says that it would be payable on December 31, 2017 as an outside date. No, the sentence following the sentence earned. No, I agree, Your Honor, and that addresses that it would be paid out of available debt and equity proceeds, available proceeds, and this is the key provision. Well, shall be paid. I'm assuming that Ms. Burton's argument when she comes back is going to be, well, it does say it's earned and not due, that she was incorrect on that, but it does say in the following sentence the developer shall be paid such portion to the extent that such proceeds are not required for other purposes. Your Honor, in Judge Blake's view and in our view was the critical clause, to the extent such proceeds are not required for other company purposes, vests the new managing member with discretion to use funds how it wishes. The managing member, the removed managing member, the developer in this case, I.M. DeBoss, is the entity. That entity is entitled to 6 percent interest from the date of construction completion until the developer's fee is paid. So you're saying it's a discretionary determination. That's correct. Are you saying that or no? No, we are saying it's discretionary based on the clause, to the extent such proceeds are not required for other company purposes. That clause vests the managing member with discretion to use funds how it deems appropriate until the outside date of December 31, 2017. Doesn't a contracting party, even with discretion, have an obligation to act in good faith? Yes, Your Honor. That's what they're alleging, that your client didn't act in good faith in making at least a part of that payment. Well, that allegation is set forth, but we believe it's not plausible under the circumstances here because of this discretionary clause. So you're saying that good faith, bad faith, it doesn't matter. Well, I believe they would have to assert some allegation, besides just a conclusory allegation of bad faith, that there's been any misuse of the discretion that was vested in the company to allocate resources to other purposes until December 31, 2017. Now, there's another issue here, and Judge Blake also relied on the Brewster v. Brennan case, a case where the District of Maryland dismissed a claim because all of the offsets and all of the accounting had not yet been performed. Here, the developer fee is subject to offsets for any harm caused by the developer or any affiliate. And this project is continuing to operate, and at some point by December 31, 2017, we'll either make a full payment of the developer fee or make less than the full payment based on offsets available to it. And if there's a disagreement at that time, then there will be a dispute. Judge Blake's finding didn't foreclose a claim on the developer fee. It only found that it was unripe until the outside date, given the discretion that the company was permitted to exercise under that clause. Turning to the removal count, Ms. Burton's argument was that there were fact-finding by the court below in holding that the judgments, as you point out, Judge Diaz, that they were judgments, not just mechanics liens, not construction liens. They were judgments on the liens, pointing out that those liens formed a basis for removal as a matter of law. She took judicial notice of the judgments, and she held that that demonstrated a failure to fund under 6.10A. 6.10A specifically provides, or I believe it's 8.04, the removal provision, specifically provides that any failure to fund under 6.10A is deemed under the contract to have a mere material adverse effect. So there is no factual finding necessary because the expressed terms of the contract deem any failure to fund under 6.10A as material. The court simply took judicial notice of the judgments and then found that that demonstrated a failure to fund. Ms. Burton says that the contract also allows her client a right to cure, but you say that that's independent of this finding of material adverse effect. Once that finding is made, that triggers the right to remove, irrespective of any cure. No, we would agree with Ms. Burton that there's a right to cure. In fact, in this case, in the record, there's a cure letter that was sent out mid-November giving the managing member 30 days to cure the deficiencies, release the liens, and make payments. The cure letter specifically, which is attached and is in the record, specifically says make your payments under 6.10, bring everything current, you have 30 days. They didn't do that. In fact, in response to the cure letter, Your Honor, they sent a letter and they attached that letter to the complaint so it's integral to the complaint and it can be considered by this court. In that letter, they not only agreed they didn't have any money to pay under 6.10A their obligations, but then they added on that the lender was prepared to foreclose if payments were not made on the mortgage. They added, and Judge Blake had the benefit of their own letter they attached to the complaint where they acknowledged an inability to pay the mortgage, which would have led to a foreclosure on the project. And that all occurred before the removal. This occurred between the notice and the removal date. Turning to the accounting, Maryland courts do generally hold that an accounting claim cannot stand as an independent cause of action, with limited exceptions not applicable here. This count, Judge Blake dismissed without prejudice, and not so much because she believed that it could be reasserted as an independent cause of action, but it could be part of a remedy relating to a payment for the return of the capital contribution in future years and or for the payment of a developer's fee when that claim becomes ripe. The accounting claim, if you look at the paragraphs, really relates to the return of capital contribution. The paragraph that appellants, the main substantive paragraph of that count, says if these aren't loans, then they're capital contributions. We have a right to know what the capital contributions are, et cetera. But this capital contribution return under the agreement, express language of the agreement isn't due for 15 years after the date of removal, and is, again, just like the developer's fee, subject to offsets for any harm caused by the managing member. Now, just to give you a sense, harm would include, in this case, the cost because the managing member was supposed to release liens, the cost that the new managing member had to incur to release liens, to pay lawyers to fight the many other construction liens that had been fought, to complete the project, to pay any unpaid bills, operating bills that existed at the time. All of those will be offsets to what ultimate payments are made when those claims are ripe. Finally, Your Honor, below we argued that there were two entities that were incorrectly included in this case. One is Small Deal Fund, which was the investor member, and the other is Raleigh Consultants, which was just a construction management firm engaged by holdings when it was managing member. These entities were included on several counts, and we believe that the obligations described here are the company's obligations and that they were improvidently included. Appellants did not brief that issue in their opening brief, and under Fourth Circuit precedent, I'll cite United States v. Al-Hamdi, 356 F. 3rd, 564. They've abandoned the issue by not addressing it in their brief. Now, they do address it in their reply brief, but in our view, it's too late. If the court does remand without affirming all of Judge Blake's opinion, we would ask that Small Deal and Raleigh, that any counts they've been included in be affirmed based on the abandonment. Thank you, Your Honor. If there are no further questions, I see my time is up. Ms. Burton, I'd be pleased to hear from you and Roboto. Thank you, Your Honor. First, I'll address the accounting question that Judge Keenan had, I believe. Essentially, we've talked about the developer's fee and why the accounting arises out of that, but I think it's also important to point out the capital contribution issue, which the appellee touched upon. As the court said in Anderson v. Watson, which is cited in our reply brief at page 12, unless the plaintiff is informed of the extent of his claim, he cannot properly bring an action of law upon it. Essentially, that ties into the fiduciary duty, which we believe exists between the managing member and the LLC in this case. Without knowing what that capital contribution is all about, without some accounting, we don't even know whether the distribution was correctly done. Our client had to take care of that K-1 distribution statement in his tax returns when he didn't receive any actual cash distribution whatsoever. They've essentially addressed it away in the briefs, but there's a real question here. The plaintiffs really cannot enforce their rights and cannot properly bring whatever causes of action that they have without that accounting. That's, again, both based on that distribution statement and as well as the non-payment of the developer's fee. Also, as Judge Keenan pointed out, Section 701, the developer fee, that next line, the developer shall be paid such portion of the developer fee from available debt and equity proceeds of the company to the extent such proceeds are not required for other company purposes. That's not discretionary. It doesn't say they can wait until 2017 and then figure it out then. It says it shall be paid if the money's there, and we don't know if the money's there because we don't have an accounting or we don't have any access to the records of the company anymore. The other point I want to make in terms of the cure issue and also the risk, it is absolutely true that the operating agreement places the risk and the obligations of running the company and finishing the project on the managing member, no question. But the managing member had a plan in place to pay these debts and satisfy the liens and pay the mortgage at construction completion, which was two weeks later. It's disingenuous at the least to say, well, they had to... The point was made that you were given a chance to cure? There's allegations in the complaint that that obligation was not provided in good faith, that we weren't given an opportunity to make those payments when, again, we had arrangements in place, namely that the next investor installment, which was due at construction completion, which was that same month. I mean, this was a project that took eight years, and they were removed just two weeks before they would have had the money to pay off those debts and finish this job in accordance with the operating agreement and the project documents. That's what's alleged in the complaint. Are you talking about the removal provision at this point? Correct, Your Honor. And you don't dispute the existence of the mechanics lien? Correct, Your Honor. And the letter gave you a 30-day period to cure? Your Honor, the letter, that's what the letter says. But I think it's also important to note that in the allegation... The letter says that. I mean, I guess... One of the difficulties I'm having is I'm just not able to locate some of the specifics of your objections. You say, well, they behaved in bad faith, but it struck me this was simply a normal contract dispute where parties are disagreeing over the implementation of a contract and over the terms of a contract. And I don't know how a dispute over contract terms or contract implementation and everything can somehow amount to bad faith. It's nothing that just leaps off the page. And part of it, you negotiated a contract that in certain respects was unfavorable to you, but you don't renegotiate it in court. I mean, you might regard some of the terms as tough, but the terms are the terms. Your Honor, the allegations of the complaint set forth particularly timing issues, that right at this last few months of the project, the managing member was asked to sign the Raleigh Agreement and bring in a third party to basically run the company for those last couple months. And in that agreement, we've alleged that Small Deal agreed to provide funding. Is there an allegation, if any allegation, though, of bad faith in this amended complaint? I really had a problem looking through it to see where there was an allegation that could amount to bad faith. The allegations are primarily timing, for example, that the new member, the special member But where do you say it in the complaint that they acted in bad faith? The actual words bad faith are found in the paragraph addressing the removal. We have it in paragraph 29, that Small Deal's removal of holdings was for the purpose of wrongfully depriving holdings of its interest and wrongfully securing benefits of the money, time, and effort that Stanley Kaiser and the other plaintiffs had devoted to the project. And then we said further. But wrongfully, I mean, you're saying that that supports your allegation of a breach of contract, right? Yes, but again, there's also bad faith in the formation of special member to replace holdings. I don't see anything that says that there's a bad faith allegation here, that they were setting this up in bad faith, that they acted in bad faith in carrying out the contract term strictly, even though the result to you was devastating. Really, when you read this complaint, I just don't see bad faith as opposed to not cutting you any breaks whatsoever under the contract. We've argued in our opening brief at page 51 that the amended complaint sets forth allegations that the 1899 LLC entities breached the duty of implied good faith and fair dealing in bad faith and with improper motives. That gets back to the point. I was interested in the response to Judge Keenan's question. It seems to me that just because you disagree with them over the terms of the contract and what the contract requires, and you have a dispute over the terms and you have a dispute over the implementation of the terms, that occurs all the time, but you can't just slap a bad faith label on that as a conclusory matter. It's the equivalent in tort of an automatic punitive damages claim every time there's a routine case of negligence. The contractual parallel to it is a bad faith allegation every time the parties disagree over a particular contract. A lot of the things that you, to the extent that you do get specific on these allegations, you say, well, the investing partner small deal promised this or promised that. A lot of that, I don't know if that's anything but parole evidence here, which the district court declined to accept. Some of the things that you introduced in the arguments struck me as not arguments over contractual terms, but you want to create disputed issues of fact by referring to various pieces of parole evidence. And that seems to me to undermine the value of the written document. You say, well, small deal did this, small deal did that. Again, that goes, you know, behavior, oral promises, this and that, but the argument wasn't framed sufficiently in terms of the contractual language. Your opponent was pretty careful in trying to address contractual language, and I think that's where the case has to bottom out, doesn't it? Yes, Your Honor, I think we tried to address the operating agreement and the amendment themselves, and I think there's language in the operating agreement amendment that shows that the court went beyond the terms in deciding the motion. I think we've spelled that out in the briefs, and, you know, as far as parole evidence, I think, again, you have to look at the contract documents, and the contract documents contemplate things like the loans, the language is there, the construction loan, the short-term loans. These are all things that are in the operating agreement, and we're not asking the court to look at evidence beyond that. It's right there in the language, and the court misinterpreted some of that language in finding that the language conclusively barred all the claims, which, at a 12B6 motion, you have to give the benefit of the doubt to the plaintiff in the allegations from the complaint. My time is up, but if you have anything further, I'd be pleased to answer your questions. We thank you very much. Thank you, Your Honor. And we'll come down and greet counsel, then we'll take just a brief recess.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Albert Diaz